UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                           :

JEFFREY TISHMAN and ARNOLD          :
WILKINSON,                                :
                                           :
                Plaintiffs,               :
                                           :
                   -v-                       :
                                           :
THE ASSOCIATED PRESS;                  :
THOMAS CURLEY, CEO                   :
(in his individual and official capacities);        :          05 Civ. 4278 (GEL)
LOU BOCCARDI, former CEO              :
(in his individual and official capacities);        :          **OPINION AND ORDER**
WILLIAM AHEARN, VP                    :
(in his individual and official capacities);        :
DONALD PINE, Director                    :
(in his individual and official capacities);        :
MICHAEL BASS, Manager                  :
(in his individual and official capacities);        :
and JOHN DOE,                             :
                                           :
                Defendants.             :
                                           :
------------------------------------------------------------x

Sherilyn R. Dandridge, The Dandridge Law Firm,
New York, New York, for plaintiffs.

Stephen J. Macri, Joseph B. Cartafalsa, Putney,
Twombly, Hall & Hirson LLP, New York, New
York, for defendants.

GERARD E. LYNCH, District Judge:

       Plaintiffs Jeffrey Tishman and Arnold Wilkinson, former employees of the Associated

Press ("AP"), bring this action against AP and several of its present and former officers, alleging

age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. §§ 621 et seq., the New York State Human Rights Law ("SHRL"), N.Y. Exec. Law §§

296 et seq., and the New York City Human Rights Law ("CHRL"), N.Y.C. Admin. Code §§ 8-

107 et seq. Defendants move for summary judgment, arguing, inter alia, that plaintiffs' claims are time-barred, or alternatively, that plaintiffs' claims lack merit. The motion will be granted.

## BACKGROUND

The following facts are undisputed or established by undisputed documentary evidence. Additional factual contentions will be addressed in later portions of this opinion.

AP, a not-for-profit news gathering cooperative, hired Jeffrey Tishman as a Librarian on May 4, 1983, and Arnold Wilkinson as an Office Assistant on September 3, 1970. (See Compl. ¶¶ 6, 8.) Wilkinson was promoted to the position of Librarian on May 23, 1976. As Librarians, both Tishman and Wilkinson were employees of AP's News and Information Research Center ("NIRC"). Defendant Michael Bass is currently AP's Director of News Operations, and from 1999 until 2003, Bass served as Director of the NIRC. (Bass Aff. ¶ 1.)

In January 1997, after negotiations with and agreement by Local 31222, News Media Guild, Communications Workers of America ("the Guild"), of which both Tishman and Wilkinson are members, AP consolidated job functions in the NIRC in order to move from a research model, relying on physical documents and books, to a model that used electronic documents and computer-based research techniques. (Bruce Aff. ¶¶ 7-10; Wilkinson Dep. 29.) Specifically, the separate job functions of "Librarians" and "Editorial Assistants" were consolidated into the single job title of "Information Specialist." (Bruce Aff. ¶ 7; Tishman Dep. 14-15.) As a result of this job restructuring, the Librarians, which included Tishman and Wilkinson, received a raise to "Class H" under the Guild wage schedule, and a weekly pay supplement. (Bruce Aff. ¶ 7; Tishman Dep. 14-15.)

As Information Specialists, Tishman and Wilkinson were expected to perform the duties that were previously performed by both the Librarians and Editorial Assistant classifications. However, over time, AP further divided Information Specialists into two categories: "researchers," who were more skilled in electronic research functions, and "lesser-skilled" "Service Desk" employees, who "generally performed limited research." (Bruce Aff. ¶ 9.) Tishman and Wilkinson were both Service Desk employees.[1] (Bass Aff. ¶ 3; Tishman Dep. 160; Wilkinson Dep. 112.)

As a result of the divergence of job duties and skills among the Information Specialists, in 2002, during negotiations over renewal of the collective bargaining agreement, the Guild requested reclassification of certain Information Specialists to the highest "Class A" designation of Newsperson. (Bruce Aff. ¶ 9.) Specifically, the Guild requested the reclassification of only those Information Specialists who performed the more skilled news research functions, and not those Specialists who were classified by AP as Service Desk employees. Accordingly, the Guild did not advocate the promotion of Tishman and Wilkinson. (Id.; Bruce Aff. Ex. C; Wilkinson Dep. 123.)

AP consented to the Guild's proposal to reclassify the more skilled researchers, a group that did not include Tishman and Wilkinson. (Bruce Aff. ¶ 10; id. Ex. D.) On June 2, 2003, seven Information Specialists were reclassified as Newspersons with attendant wage increases. (Bruce Aff. Ex. D.) Three of the seven employees promoted from Information Specialist to

---

[1] Tishman and Wilkinson both contend that they were "cross-trained" as researchers and Service Desk employees, but that AP refused to "rotate[]" them to the "Research function," thereby preventing them from being promoted to Newspersons. (See Tishman Aff. ¶¶ 15-19; Wilkinson Aff. ¶¶ 15-19.) However, neither Tishman nor Wilkinson dispute that they only performed the functions of Service Desk employees.

3

Newsperson were over 40 years old. (Bruce Aff. ¶ 10; Cartafalsa Aff. ¶ 8.) Neither Tishman nor Wilkinson filed a grievance with the Guild,[2] or otherwise complained to AP about AP's decision to reclassify certain other Information Specialists as Newspersons.[3] (Tishman Dep. 72-73; Wilkinson Dep. 103-05, 141.)

In January 2004, AP initiated a review of its operations for methods to increase efficiency and reduce its operating costs. At that time, AP was in the process of moving its headquarters from Rockefeller Center to its present location. (Bruce Aff. ¶ 12.) During that review, AP determined that the work performed by the Information Specialists on a 24-hour per day, 7-day per week basis could be covered more effectively and efficiently in its Spokane Data Center, which operated a larger, more advanced call center. (Id.; Bass Aff. ¶ 6.) Shortly thereafter, in May 2004, AP decided to transfer the Service Desk employees to Spokane, Washington. (Bruce Aff. ¶ 12; Bass Aff. ¶ 6; Wilkinson Dep. 116.) The decision to transfer the NIRC Department to Spokane was made by Michael Bass, then age 42, Mike Silverman, then age 60, and Jessica Bruce, then age 38. (Bruce Aff. ¶ 13; Bass Aff. ¶ 6.) Nine AP employees were affected by the transfer, including both plaintiffs and four employees who were under the age of 40. (Bruce Aff. ¶ 20.)

Under the collective bargaining agreement between AP and the Guild, AP reserves the

---

[2] The collective bargaining agreement between AP and the Guild has a provision enabling the Guild to file a grievance or demand for arbitration for violation of any portion of the contract, including the non-discrimination provision. (See Bruce Aff. ¶¶ 3, 6; see, e.g., Bruce Aff. Ex. A; Tishman Dep. 94; Wilkinson Dep. 41.)

[3] Although Tishman and Wilkinson claim that they registered their frustration at not being promoted with their union shop steward (Tishman Dep. 108; Wilkinson Dep. 103), they never followed up on those complaints, filed a grievance, or registered complaints directly with AP.

right to transfer work to other business locations. Pursuant to the terms of the collective bargaining agreement, the Information Specialists were given the option of accepting the transfer and related relocation benefits, or resigning and accepting severance benefits, known as dismissal indemnity. (Bruce Aff. ¶¶ 15, 16; Bruce Aff. Ex. A, Arts. 7, 9; Tishman Dep. 107-09, 113; Wilkinson Dep. 114, 117-18.) Although the affected employees were required to decide within seven days whether they would accept the transfer opportunity, they were not given a deadline within which to complete the physical transfer to Spokane.[4] (Bruce Aff. ¶ 17.) A Specialist who declined the transfer offer was eligible to receive the severance payments upon execution of a Settlement Agreement and Release of Claims ("Release"). (Bruce Aff. Ex. A, Art. 6, ¶ 5; id. at Art. 7, ¶ 1.) The amount of the severance payments depended on the employee's wage class and length of service. (Bruce Aff. ¶ 18; Bruce Aff. Ex. A, Art. 7 ¶ 2.) Tishman was offered a severance package of $42,586.02, representing 51 weeks' pay, and Wilkinson was offered a severance package of $63,461.52, representing 76 weeks' pay.[5] (Bruce Aff. ¶ 19; Tishman Dep. 181; Wilkinson Dep. 118.)

Tishman and Wilkinson declined both the transfer and severance offers. (Tishman Dep. 113; Wilkinson Dep. 114.) The remaining seven Information Specialists accepted the severance offers in lieu of transfer and executed the Release. (Bruce Aff. ¶ 19.) AP paid out almost

---

[4] According to Tishman and Wilkinson, as a result of the Spokane transfer, the Guild filed a grievance against AP because AP had given only one week notice of the Spokane transfer instead of the four required by the union contract. (See Tishman Aff. Ex. 1; Tishman Aff. ¶ 13; Wilkinson Aff. ¶ 13.) However, Tishman and Wilkinson do not contend that the grievance filed by the Guild against AP was in any way related to allegations of discriminatory conduct.

[5] Tishman and Wilkinson dispute AP's motivation for the transfer and argue that the transfer amounted to a constructive discharge (see Tishman Aff. ¶ 10; Wilkinson Aff. ¶ 10), but they do not dispute any of the relevant facts surrounding that transfer (see Tishman Aff. ¶¶ 5, 8, 12; Wilkinson Aff. ¶¶ 5, 8, 12).

5

$200,000 in severance and dismissal payments and over $50,000 in accrued vacation and notice pay to the Information Specialists who declined the transfer offer and signed the Release. (Bruce Aff. ¶ 21.) Of the Specialists who declined the transfer and accepted the severance offer, three were under 40 years old. (Bruce Aff. ¶ 20; see Tishman Dep. 109; Wilkinson Dep. 113.)

AP deemed Tishman and Wilkinson to have resigned from their employment by refusing the transfer. (Bruce Aff. Ex. A, Art. 7.) Accordingly, on May 14, 2004, AP terminated Tishman's and Wilkinson's employment. At the time of their termination, Tishman was 54 years old and Wilkinson was 58 years old. (Compl. ¶¶ 5, 7.) Again, neither Tishman, Wilkinson, nor any other AP employee complained to AP that the proposed transfer or their ultimate discharge was discriminatory, nor did any employee file a grievance about either event. (Bruce Aff. ¶ 22.) Indeed, during their several decades of employment, plaintiffs never once complained to AP or filed a grievance with the Guild alleging any discriminatory conduct.[6] (See Tishman Dep. 15, 108; Wilkinson Dep. 103.)

On August 18, 2004, Tishman and Wilkinson each filed identical charges with the Equal Employment Opportunity Commission ("EEOC"), alleging age discrimination and retaliation. (Cartafalsa Aff. Exs. 5 & 6.) The charges were cross-filed with the New York State Division of Human Rights. (Id.) At the conclusion of its investigation, the EEOC found no evidence of age discrimination, and issued right-to-sue letters to both Tishman and Wilkinson. (Id.)

---

[6] Wilkinson argues that he complained about age discrimination to defendant Bass in September 2003, when he e-mailed Bass inquiring about the status of his performance review. (Tishman Aff. ¶ 24; Wilkinson Aff. ¶ 24; Tishman Aff. Ex. 7.) However, this argument is belied by the record – the full text of Wilkinson's e-mail reads, "Mike, [w]hen will we be able to receive our job evaluations? I remember two years ago you said we'd be receiving them. So far, nothing." (Tishman Aff. Ex. 7.) In response, Bass, who had been recently promoted, stated "I guess that's a question you'll have to take up with my successor." (Id.) Neither Wilkinson's e-mail, nor Bass's response, refer to any allegations of discriminatory conduct.

6

On April 29, 2005, Tishman and Wilkinson filed the instant suit, claiming that the defendants had discriminated against them on the basis of their age by: (1) failing to train them for the more skilled researcher position between 1997 and 2003; (2) failing to promote them to the position of Newsperson in June 2003; and (3) constructively discharging them by subjecting them to the Spokane transfer in May 2004. Defendants moved for summary judgment on April 13, 2007; plaintiffs responded on June 11, 2007. The motion was fully briefed as of June 25, 2007.

**DISCUSSION**

Plaintiffs' allegations of discriminatory conduct reach back to 1997, when AP reorganized its structure and promoted plaintiffs to the position of Information Specialist. However, plaintiffs have withdrawn any claims under federal law predating October 24, 2003, or 300 days before plaintiffs filed their respective EEOC charges, a sound decision as those claims are time-barred. (Pls. Mem. 5.) See 29 U.S.C. § 626(d); Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 236 (2d Cir. 2007). Therefore, only the constructive discharge claim remains viable under federal law. As discussed below, plaintiffs' constructive discharge claim is based solely on speculation and conjecture, and therefore must be dismissed. Moreover, even assuming arguendo that plaintiffs' failure to promote claim could be interpreted, not as a discrete, isolated event, but as a component of the constructive discharge claim and therefore not time-barred, that claim is also based solely on plaintiffs' speculation and conjecture. Finally, even assuming arguendo that the failure to train claim, which may reach back to 2002 under New York's statute of limitations, is meritorious (a dubious proposition, at best), the Court declines to exercise supplemental jurisdiction over that claim.

## I.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court's responsibility is to determine whether there is a genuine issue to be tried, and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. Id. at 254-55. However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. Anderson, 477 U.S. at 250. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. Id. at 248. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) ("If . . . there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.") (citation and internal quotation marks omitted). In addition, "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002); see also id. ("The nonmoving party must

8

go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (alterations in original) (citation and internal quotation marks omitted).

## II. ADEA Claims

### A. Constructive Discharge

Plaintiffs claim that the Spokane transfer was actually a veiled attempt by defendants to terminate plaintiffs' employment on the basis of their age. Thus, plaintiffs claim that they were constructively discharged in violation of the ADEA.[7] Because plaintiffs' claim relies entirely on their own opinion and is completely devoid of evidentiary support – indeed, plaintiffs actually conceded during deposition that they have no evidence to support their claim, other than their own opinion (Tishman Dep. 100; Wilkinson Dep. 59) – summary judgment is warranted here.

To prevail on an ADEA claim, "the plaintiff must first establish a prima facie case by showing membership in a protected class, qualification for the position, an adverse employment action, and circumstances that give at least minimal support to an inference of discrimination." Galabaya v. N.Y. City Bd. of Educ., 202 F.3d 636, 639 (2d Cir. 2000) (internal quotation marks omitted). If plaintiff establishes a prima facie case, the burden of proof then shifts to the employer to show "some legitimate, non-discriminatory reason" for the employment action challenged by the plaintiff. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see

---

[7] Plaintiffs assert their ADEA claim against both AP and Bass individually. However, there is no individual liability under the ADEA. See Ocasio v. Riverbay Corp., No. 06 Civ. 6455, 2007 WL 1771770, at *7 (S.D.N.Y. June 19, 2007). Thus, insofar as plaintiffs assert a federal claim against Bass, that claim is dismissed, and AP is the only remaining defendant with respect to plaintiffs' ADEA claim. Nevertheless, for the sake of consistency, the Court will continue to refer to AP as "defendants" in the following analysis.

9

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).[8] If the employer makes such a showing, the burden shifts back to the plaintiff to present factual evidence demonstrating that the defendant's legitimate reason was merely a pretext for discrimination. St. Mary's, 509 U.S. at 506-07.

Plaintiffs argue that defendants' "ultimatum" to plaintiffs "to either transfer across the country" from New York City to Spokane, or to resign with severance, amounted to a "constructive discharge and is a pretext for defendants' age discrimination." (Pls. Mem. 8 (internal quotation marks omitted).) Specifically, plaintiffs argue that defendants decision to "reduc[e]" their New York City "[work]force" by transferring the Information Specialists to Spokane was actually a "sham" intended solely to cover for a discriminatory animus. (Id. at 10, citing Danzer v. Norden Sys., Inc., 151 F.3d 50 (2d Cir. 1998).) Defendants argue that plaintiffs have not presented sufficient evidence by which a reasonable juror could determine that the transfer was motivated by a discriminatory animus, or alternatively, that defendants have presented legitimate, non-discriminatory reasons for the transfer and plaintiffs have not presented sufficient evidence by which a reasonable juror could determine that those reasons were merely a pretext for discrimination. Assuming arguendo that the Spokane transfer constitutes an adverse employment action,[9] plaintiffs have presented no evidence either that the transfer was motivated by a discriminatory animus, or that defendants' proffered legitimate, non-

---

[8] The burden of proof scheme set forth in McDonnell Douglas for Title VII actions applies equally to discrimination claims under the ADEA. O'Sullivan v. N.Y. Times, 37 F. Supp. 2d 307, 313 (S.D.N.Y. 1999).

[9] Defendants concede, for purposes of this motion, that the Spokane transfer was an adverse employment action, regardless of whether it is properly characterized as a "constructive discharge." (Defs. Reply 4 n.1.)

10

discriminatory reasons for the transfer were merely a pretext for discrimination.

Plaintiffs' evidence in support of their argument that the Spokane transfer was motivated by a discriminatory animus is not merely insufficient to defeat defendants' motion for summary judgment – it is non-existent. First, it is undisputed that four of the nine employees who were transferred to Spokane were outside of the protected age group – indeed, one affected employee was just 30 years old. Plaintiffs have presented no explanation, credible or otherwise, for why AP would transfer employees in both the protected age group and the non-protected age group if it intended to discriminate on the basis of age. A reasonable juror could not infer discrimination under such circumstances, where almost half of the employees who suffered the same adverse employment action as plaintiffs were outside of the protected class. See Vinson v. Bryant & Stratton Bus. Inst., Inc., No. 92-CV-0762E(F), 1995 WL 307594, at *8 (S.D.N.Y. 1995) (no reasonable inference of age discrimination where eight of the seventeen employees laid off, and ten of the twelve employees retained, were members of the protected class). See, e.g., Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 118 (2d Cir. 1991); Parcinski v. Outlet Co., 673 F.2d 34, 36 (2d Cir. 1982); Pisana v. Merrill Lynch & Co., No. 93 Civ. 4541, 1995 WL 438715, at *4 (S.D.N.Y. July 24, 1995).

Moreover, plaintiffs concede that they never witnessed anyone at AP make any age-based derogatory comments, either in connection with the Spokane transfer or in any other context, nor did they ever hear about such comments second-hand. (Tishman Dep. 47-49; Wilkinson Dep. 55-57.) Although such direct evidence of discriminatory intent is not required to survive a motion for summary judgment, and a discriminatory animus may be inferred from indirect evidence such as preferential treatment of other similarly-situated employees, see Holtz v.

11

Rockefeller & Co., 258 F.3d 62, 82 (2d Cir. 2001), as previously established, plaintiffs were treated identically to other similarly-situated employees outside of the protected class. Thus, neither direct nor indirect evidence supports plaintiffs' contention that the Spokane transfer was motivated by a discriminatory animus.

Furthermore, plaintiffs concede that defendants have presented legitimate, non-discriminatory business reasons for the Spokane transfer (Pls. Mem. 7), and plaintiffs have presented no credible evidence that those reasons were merely a pretext for discrimination. According to defendants, the decision to transfer the Information Specialists to Spokane arose from AP's desire to "reduce its fixed operating costs" by centralizing the functions of the Service Desk in one location. (Bruce Aff. ¶ 12.) Although plaintiffs argue that the transfer offer was merely a "sham" to discharge them on the basis of their age, plaintiffs have presented no credible evidence for their contention.

For example, plaintiffs argue that AP had "represented" to the Information Specialists prior to the Spokane transfer that the Specialists would move, along with the rest of the company, to the new Rockefeller Center location, even though AP had already decided that the Specialists would move to Spokane, and even though AP "had already hired and trained employees for the Spokane[,] Washington operation by the time [p]laintiffs were given their notices to accept the severance package or transfer to Washington State." (Pls. Mem. 12.) But even if AP had falsely represented to the Information Specialists that they would be moved to the Rockefeller Center location, plaintiffs do not dispute that the representation was made to *all* of the Specialists, including those outside of the protected class, and therefore the alleged false representation could not be reasonably interpreted as evidence of pretext for a discriminatory

12

animus. In addition, even if AP's alleged representation to the Information Specialists that their jobs were safe in New York City, followed shortly thereafter by the Spokane transfer offer, could be characterized as unfair to its employees, it was unfair to all of the Specialists, not just plaintiffs, and such decisions are not reviewable by the Court absent a discriminatory animus. See Gray v. Robert Plan Corp., 991 F. Supp. 94, 100 (E.D.N.Y. 1998) ("[The ADEA] may not be invoked merely to challenge the wisdom of any employer's decision."), quoting Orisek v. Am. Inst. of Aeronautics and Astronautics, 938 F. Supp. 185, 190 (S.D.N.Y. 1996).

Moreover, plaintiffs provide no evidence, other than their own opinion, that AP would not have transferred their employment to Spokane had plaintiffs accepted the transfer offer. Conversely, defendants have shown that Information Specialist positions were available in Spokane, had plaintiffs accepted the transfer. (Bruce Reply Aff. ¶¶ 2-4.) Finally, it is undisputed that four of the five employees who were ultimately hired in Spokane to perform the Information Specialist functions that were initially offered to, and declined by, the Information Specialists in New York were in the protected age class. (Id. ¶ 4.) Thus, plaintiffs' contention that the Spokane transfer was merely a tool for AP to replace older employees such as plaintiffs with employees outside of the protected class is baseless. See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("[A] plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.").

Accordingly, because plaintiffs have presented no evidence, "other than [their] own opinion," that the Spokane transfer was discriminatory (Tishman Dep. 100), defendants' motion for summary judgment on plaintiffs' constructive discharge claim is granted.

B.     Failure to Promote

Although plaintiffs have presented no evidence, either direct or circumstantial, that the Spokane transfer was motivated by a discriminatory animus, they nevertheless argue that the discriminatory animus can be inferred from defendants' failure to promote them in June 2003. As discussed supra, any claims of discriminatory conduct arising under federal law prior to October 2003 are time-barred, including the failure to promote claim. However, even assuming arguendo that plaintiffs' alleged constructive discharge was the "cumulative" result of defendants' prior discriminatory conduct which began with their failure to promote plaintiffs in June 2003, thereby rendering defendants' failure to promote plaintiffs not a "discrete," isolated event, but instead a component of the constructive discharge claim and therefore at least potentially not time-barred, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002), that claim lacks merit as well and will be dismissed.

Plaintiffs argue that, in June 2003, AP promoted seven Information Specialists to Newsperson as the first step in plaintiffs' constructive discharge. Specifically, plaintiffs argue that those seven Information Specialists were promoted to Newsperson in order to insulate them from the Spokane transfer, which would later be offered to all of the remaining Information Specialists with the hopes that plaintiffs specifically would not accept the transfer. Thus, according to plaintiffs, AP only promoted the other Specialists so that defendants could later discharge plaintiffs on the basis of their age without any incriminating evidence of discriminatory intent.

Plaintiffs' theory, which requires several illogical steps, fails for several reasons. First, plaintiffs have presented no evidence that the promotion of certain Information Specialists to

Newsperson was part of any larger plan to transfer, or discharge, the remaining Specialists, including plaintiffs. Instead, it is undisputed that, at the time AP promoted the Information Specialists to Newspersons, AP had not yet decided to transfer the Service Desk work performed by the Information Specialists to Spokane. (Bass Aff. ¶ 6.) Thus, plaintiffs' contention that there was a larger plan in place in June 2003 has no support in the record.

Moreover, even assuming arguendo that AP promoted certain Information Specialists simply to insulate those Specialists, and not others, from the Spokane transfer, plaintiffs have presented no evidence, either direct or circumstantial, that the promotion was motivated by a discriminatory animus. Plaintiffs were not treated differently from similarly-situated employees outside of the protected class with respect to the June 2003 promotions. It is undisputed that three of the seven Information Specialists who were promoted to Newspersons were within the protected age class, including one who was 52. (Bruce Aff. ¶ 29.) Moreover, as discussed supra, those employees who were still Information Specialists in May 2004, and who were therefore subject to the Spokane transfer, included four who were under 40 and five, including the two plaintiffs, who were over 40. (Id. ¶ 45.) Again, plaintiffs have presented no credible explanation for why AP would promote some protected age group employees and not others, or transfer and/or discharge both protected and non-protected age group employees, if it intended to discriminate on the basis of age.

In addition, the selection of which Information Specialists to promote to Newsperson was made in the first instance, not by AP, but by the Guild. It is undisputed that the Guild proposed the promotion of only those Information Specialists who had performed more difficult, higher-rated work since the company's 1997 reorganization, a group that did not include plaintiffs.

15

Although plaintiffs also allege that AP prevented them from performing the more difficult work for discriminatory reasons, and therefore that AP unlawfully prevented them from being promoted, they do not dispute that they indeed did perform only the functions of Service Desk employees (Pls. Mem. 3 (noting that plaintiffs' request to rotate to the Research function of NIRC was "never granted")), nor do they dispute that it was the Guild, and not AP, that first selected which Information Specialists would be promoted. Moreover, it is undisputed that AP only promoted the Specialists as a "concession made in response to Guild economic demands during collective bargaining." (Defs. Mem. 22.) Thus, as AP neither determined who should be promoted, nor proposed any promotions at all, no reasonable juror could find that plaintiffs' non-promotion was the first step in a two-step effort to discharge them for discriminatory reasons.

The lack of any credible evidence in support of plaintiffs' failure to promote claim "tilt[s]" the record so far in the "direction" of defendants that summary judgment is warranted here. Danzer, 151 F.3d at 54. Accordingly, defendants' motion for summary judgment on plaintiffs' failure to promote claim is granted.

### III.  Supplemental Jurisdiction

Having disposed of plaintiffs' constructive discharge and failure to promote claims on their merits, the only remaining claim asserted in this case is the failure to train claim. Specifically, plaintiffs allege that defendants failed to train plaintiffs on the higher-skilled researcher functions because of their age, thereby preventing them from receiving a promotion in June 2003 and ultimately leading to their termination. However, it is undisputed that the failure to train claim is based on independent, discrete events occurring between 1997 and 2003. (See, e.g., Tishman Aff. ¶ 19; Wilkinson Aff. ¶ 19.) Thus, the failure to train claim is time-barred

16

under federal law, Morgan, 536 U.S. at 114; see Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162, 2169 (2007) ("A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination."), and the merits of that claim, insofar as it is predicated on a violation of the ADEA, cannot be considered by the Court.[10]

However, plaintiffs argue that their failure to train claim, insofar as it is predicated on a violation of state and city law, at least partially survives under New York's statute of limitations. (Pls. Mem. 5.) Plaintiffs are correct. New York's general three-year statute of limitations applies to plaintiffs' SHRL and CHRL claims. N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d); see Quinn v. Green Tree Corp., 159 F.3d 759, 765 (2d Cir. 1998); Greene v. Trustees of Columbia Univ., 234 F. Supp. 2d 368, 377 (S.D.N.Y. 2002). The three year statute of limitations is measured from April 29, 2005, the date that plaintiffs filed this action. See Quinn, 159 F.3d at 765; Greene, 235 F. Supp. 2d at 377. Thus, insofar as plaintiffs' SHRL and CHRL claims are based on allegations of discriminatory conduct occurring after April 29, 2002, those claims survive under the New York statute of limitations.

However, because plaintiffs' federal claims are dismissed, the Court must decide whether federal jurisdiction exists over the remaining state and city claims. "[W]hen the federal claims are dismissed the 'state claims should be dismissed as well.'" In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 61 (2d Cir. 1998), quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726

---

[10] Nor do plaintiffs argue that AP's alleged failure to train them on the higher-rated work should be regarded as part and parcel of their failure to promote and constructive discharge claims, thereby potentially rendering the failure to train claim timely; indeed, such an argument would strain credulity, as it would entail inferring that AP began scheming in 1997 to discharge plaintiffs seven years later because of their age.

17

(1966). Although exercising supplemental jurisdiction is discretionary, the usual case "'will point toward declining jurisdiction over the remaining state-law claims.'" Id., quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); see 28 U.S.C. § 1367(c)(3); Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) (collecting cases); see also Seabrook v. Jacobson, 153 F.3d 70, 72 (2d Cir. 1998) (noting that it is particularly appropriate for the district court to dismiss where "the federal claim on which the state claim hangs has been dismissed"); Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

In the instant case, although dismissal of plaintiffs' pendent SHRL and CHRL claims is "not absolutely mandatory," Baylis v. Marriott Corp., 843 F.2d 658, 665 (2d Cir. 1988), the Court declines to exercise jurisdiction over plaintiffs' state and city law claims. While discovery has been completed and the instant case has proceeded to the summary judgment stage, it does not appear that any discovery would need to be repeated if plaintiffs' pendent claims were brought in state court. See, e.g., Kelsey v. City of New York, No. 03 Civ. 5978, 2006 WL 3725543, at *11 (E.D.N.Y. Sept. 18, 2006) (declining to exercise jurisdiction over state claim where, inter alia, "it is not clear to the [c]ourt why the discovery would need to be repeated if the [state law] claim is litigated in state court"). Furthermore, "[s]ince [New York's CPLR § 205] allow[s] a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations," plaintiffs will not be prejudiced by the dismissal of their SHRL and CHRL claims. Trinidad v. N.Y.C. Dep't of Corrs., 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006) (alterations in original), quoting Mayer v. Oil Field Sys. Corp., 620 F. Supp. 76, 77-78 (S.D.N.Y. 1985); see Henkin v. Forest Lab., Inc., No. 01 Civ. 4255, 2003 WL 749236, at *10 (S.D.N.Y.

18

March 5, 2003) (declining to exercise supplemental jurisdiction in part where "plaintiff will not be barred from bringing her claim before the state court, since her claim is tolled under New York Civil Practice Law § 205(a)"). Accordingly, having considered the "balance of factors . . . under the pendent jurisdiction doctrine," including "judicial economy, convenience, fairness, and comity," plaintiffs' SHRL and CHRL claims are dismissed without prejudice. Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (where "federal-law claims are eliminated before trial, the . . . factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims").

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted as to plaintiffs' ADEA claims. Because the Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state and city law claims, those claims are dismissed without prejudice.

SO ORDERED.

Dated: New York, New York
November 19, 2007

GERARD E. LYNCH
United States District Judge

19